# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-2068-RM-NYW

ANTOINE BRUCE,

      Plaintiff,

v.

ANTHONY OSAGIE,

      Defendant.

---

## RECOMMENDATION AND ORDER OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the following motions:

1. Defendant's Motion for Summary Judgment [#176, filed January 6, 2017];[1]

2. Plaintiff's Motion for Leave to File Amended Complaint ("Motion to Amend") [#181, filed on January 26, 2017];

3. Plaintiff's "Motion for Court to Deny Defendant's Motion for Summary Judgment (Doc. #176) or in the Alternative Grant the Plaintiff an Enlargement of Time and/or a Continuance (Fed. R. Civ. P. 6(b), or Fed. R. Civ. P. 56(f))" ("Motion to Deny Summary Judgment") [#193, filed March 22, 2017]; and

4. Plaintiff's "Motion to the Court for an Order to Defendant to be Issued Compelling Defendant to Follow the Court's November 16, 2016 Order Granting Plaintiff's 'Motion

---

[1] In this Recommendation and Order, this court uses the convention [#__] to denote filings made on the court's Electronic Court Filing ("ECF") system in this action. For filings made in Mr. Bruce's related cases, this court identifies the case number and uses the convention [ECF No. ___]. Both conventions refer to the page number assigned by the ECF system.

to File Third Request for Production of Documents; Electronically Stored Information and/or Inspection of Tangible Things' (Doc. No. #158)" ("Motion to Compel") [#197, filed April 21, 2017].

These Motions were referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), the Order of Reference dated July 6, 2015 [#43], and the memoranda dated January 26, 2017 [#182], March 13, 2017 [#190], March 22, 2017 [#194], and April 21, 2017 [#199]. This court has reviewed the Motions and the associated briefing, the entire case file, and the applicable law, and respectfully recommends that the Motion for Summary Judgment be GRANTED, that the Motion to Amend be DENIED, and that the Motion to Deny Summary Judgment be DENIED. Additionally, IT IS ORDERED that the Motion to Compel is DENIED.

## BACKGROUND

This court has recounted the background of this case in multiple recommendations and orders, and recites it again here only to the extent necessary to provide the appropriate context for the pending Motions. Plaintiff Antoine Bruce ("Plaintiff" or "Mr. Bruce") is in the custody of the Federal Bureau of Prisons, and is currently incarcerated at the Administrative Maximum Facility ("ADX") at the Federal Correctional Complex in Florence, Colorado. Plaintiff initiated this action by filing *pro se* a Prisoner Complaint and a Prisoner's Motion and Affidavit for Leave to Proceed Pursuant to 28 U.S.C. § 1915, which the court granted. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

### Arriving at the Operative Pleading

Section 1915 and the Local Rules of this District require a court to evaluate a prisoner complaint and dismiss *sua sponte* an action at any time if the action is frivolous, malicious, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. §

1915(e)(2)(B); D.C.COLO.LCivR 8.1(b).  On March 17, 2015, the court observed that Mr. Bruce is subject to filing restrictions pursuant to 28 U.S.C. § 1915(g), as a result of the court having dismissed at least three of Mr. Bruce's previous civil actions as lacking merit.  *See* [#33]; *see also* [#42 at 1].[2]  The court thus vacated the September 8, 2014 Order granting Plaintiff leave to proceed pursuant to § 1915 and directed him to show cause why he should not be denied leave to proceed *in forma pauperis*.  [*Id.*]  Rather than file a Response to the Order to Show Cause, on April 9, 2015, Plaintiff filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction ("Motion for TRO/Preliminary Injunction"), [#35], and a Prisoner's Motion and Affidavit for Leave to Proceed Pursuant to 28 U.S.C. § 1915, [#34], in which he claimed imminent danger of serious physical injury because Defendant Osagie refuses medical treatment for the extreme swelling in his feet and ankles.  Also, in the § 1915 Motion, Plaintiff stated he was having panic attacks, heart palpitations, and chest pains with labored breathing, and that he thinks he has diabetes, but Defendant Osagie will not order the necessary tests.  Then, on May 7, 2015, Plaintiff filed a Motion to Amend, [#36], and attached another Amended Complaint, [#36-1], in which he named different defendants and raised new claims.  The court construed both the § 1915 Motion and the Motion for TRO/Preliminary Injunction as a Response to the March 17, 2015 Order to Show Cause and found that Plaintiff failed to state specific factual descriptions of how, in each of the three claims he raised in the February 12 Complaint, Defendants had placed him in imminent danger of serious physical injury.  [#37].  However, as to Plaintiff's alleged inability to walk due to the extreme pain caused by the swelling in his feet and ankles, the court

---

[2] Section 1915(g) states that "[i]n no event shall a prisoner bring a civil action…under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action…in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."  28 U.S.C. § 1915(g).

indicated it would withhold any decision regarding Plaintiff's ability to proceed under § 1915. [*Id.* at 8]. The court then directed Plaintiff to pay the $400.00 filing fee if he desired to proceed with the claims that failed to assert an imminent danger of serious physical injury, and advised that the only proper filing at that time was the payment of the filing fee. [*Id.* at 9].

On June 22, 2015, rather than pay the fee, Plaintiff filed another motion for a temporary restraining order and/or preliminary injunction. [#41]. The court found that the motion, for the most part, was a statement of new claims involving different individuals. *See* [#42 at 3]. The court stated that it would not consider the new claims because it had advised Plaintiff in the May 20, 2015 Order denying him leave to proceed pursuant to § 1915 that only payment of the fee was proper at that time. [*Id.*] The court in the same order drew the case in part and dismissed in part, dismissing all defendants except for Defendant Osagie and dismissing all claims except for what the court construed as a claim regarding the excessive swelling in Plaintiff's ankles and feet as asserted in the Motion for TRO/Preliminary Injunction. [#42 (citing [#35])]. The case was then reassigned to the Honorable Raymond P. Moore and the undersigned Magistrate Judge. *Id.* The court has since described Plaintiff's single claim as one for deliberate indifference to his serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment arising from Defendant's alleged failure to treat extreme swelling in Plaintiff's feet and ankles, also referred to as pitted edema. *See, e.g.,* [#172 at 1-2 (citing #35 at 3 ¶ 4)]. Defendant filed an Answer to the claim on March 15, 2016. [#80].

<u>Subsequent Attempts to Amend</u>

Following the close of pleadings and before this court could hold a Scheduling Conference, Plaintiff filed multiple requests for injunctive relief in which he raised numerous allegations not associated with the swelling in his feet and ankles and that did not implicate

Defendant Osagie. *See* [#87, #103]. In particular, Plaintiff asserted allegations regarding his ongoing medical treatment (or lack thereof), that prison officials were tampering with his legal mail, and that prison staff were withholding manila envelopes for the purpose of hindering his access to the courts. *See* [#87]. In the first Recommendation addressing new allegations, this court found that the requested relief should be denied and informed Mr. Bruce that he was barred from asserting claims not related to the pending action. *See* [#90]. In a second Recommendation, this court again noted that Plaintiff had not articulated "any nexus between his underlying claim involving edema in his legs and ankles with the myriad of physical ailments," as set forth in the motions for injunctive relief, or that he was in imminent danger of bodily harm. *See* [#117]. In both instances, this court recommended denying any request to amend or supplement the claim based on allegations raised in [#87] and [#103]. Judge Moore subsequently adopted these recommendations. *See* [#184].

### Pretrial Schedule and Discovery

On July 26, 2016, this court held a Status Conference at which it set certain pretrial dates and deadlines. *See* [#124]. In relevant part, the court wrote, "[g]iven the duration of this matter and the multiple amendments by Plaintiff to date, any proposed joinder of parties or amendments of pleading must satisfy both the good cause standard under Rule 16(b) and the standard for amendment under Rule 15(a)." [*Id.*]

Between August 1, 2016 and November 14, 2016, Mr. Bruce served Defendant with three sets of requests for production and one set of interrogatories and requests for admissions. *See* [#128, #128-1, #133, #141, #152]. On October 24, 2016, Mr. Bruce filed a First Motion to Compel, arguing that Defendant had provided only partial responses, and in certain instances no response, to approximately eight discovery requests. *See* [#142]. The requests at issue

implicated "photographs, video recordings, or movies taken of Plaintiff since June 24, 2011," documenting "use of force team" on Plaintiff, and asked for Plaintiff's "sick call requests sheets," Plaintiff's medical records, and materials pertaining to Plaintiff's  institutional chronological disciplinary report ("CDR") at ADX, all dating from June 24, 2011.  [*Id.*]  On November 7, 2016, Mr. Bruce filed a Second Motion to Compel, asserting that Defendant's attorneys were "interfering, frustrating and/or impeding [his] ability or efforts in viewing and studying" the CDR, which dates from 2011 through October 14, 2016 and is stored on a CD and consists of 236 pages  *See* [#149 at 2].  Plaintiff asserted that the requested materials are relevant to his sole remaining claim because "he could possibly identify use-of-force incidents where Defendant [Osagie] was present, or where he participated and displayed deliberate indifference to the pain and/or swelling in Plaintiff's legs, ankles and/or feet," and "where the Defendant stood by allowing Plaintiff's ankles and feet to be injured by prison staff." [#163 at 3].  The Parties appeared to agree that the CDR and a pending-incident report were relevant for this purpose and this purpose alone.  *See* [#161 at 2-3; #163 at 5].  The Parties also appeared to agree that Defendant Osagie had made the CDR available for Mr. Bruce's inspection on multiple occasions, but under conditions that Mr. Bruce deemed unsatisfactory.[3]  Ultimately, this court denied the Motions to Compel in an Order dated January 5, 2017.  *See* [#172].

On January 6, 2017, Defendant filed the Motion for Summary Judgment.  [#176].  On January 26, 2017, Plaintiff filed the Motion to Amend.  [#181].  Mr. Bruce did not file a response

---

[3] Mr. Bruce generally alleged that the computer on which he was required to view the CDR "was intentionally moved from one environment that was adequately heated and noise free, to an environment that has excessively low temperatures and excessive noise." [#163-1 at ¶ 3; #163 at 2-3].  He also alleged that the cold temperature of the room caused him "substantial or severe pain and discomfort throughout his body, combined lightish blue colored fingers, fatigue, decreased motion throughout his body – especially his hand/fingers and feet with loss of focus and/or concentration."  [#163 at 3].

to the Motion for Summary Judgment by January 27, 2017, the deadline proscribed by the Local Rules, and this court *sua sponte* extended the deadline up to and including February 27, 2017. *See* [#183]. Mr. Bruce did not file a response by that date. Defendant filed a Response to the Motion to Amend on March 13, 2017 [#192], and Plaintiff filed a Reply on March 27, 2017 [#195]. A few days earlier, on March 22, 2017, Mr. Bruce filed the Motion to Deny Summary Judgment. [#193]. Then, on April 21, 2017, Mr. Bruce filed the Motion to Compel, [#197], and a Supplement to the Motion to Deny Summary Judgment. [#198].

## ANALYSIS

The proposed amended complaint contains allegations relevant to the operative claim and asserts new claims that are essentially derivative theories of the operative claim. *See* [#181-1]. In other words, the proposed amended complaint remains focused on Defendant Osagie's alleged failure to provide adequate medical treatment to address the swelling in Plaintiff's ankles and feet, resulting in a violation of the Eighth Amendment's proscription against deliberate indifference. I address the Motion for Summary Judgment first because Defendant's argument, and the record he provides in support thereof, is both broad and specific enough to address the new allegations and theories of liability asserted in the proposed amended complaint. For the reasons stated below, I find that Plaintiff has not carried his burden of demonstrating a genuine issue of material fact exists regarding Defendant Osagie's conduct, and that the Motion to Amend should be denied on the basis of undue delay and futility.

## I.     The Motion for Summary Judgment

### A.     Legal Standard

Defendant Osagie moves for summary judgment on Mr. Bruce's sole remaining claim related to swelling and pain associated with his ankles and feet. Summary judgment is

appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). However, the nonmovant, Mr. Bruce here, must establish at a minimum an inference of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir. 1994) (citation omitted). When the moving party does not bear the ultimate burden of persuasion at trial, and Defendant Osagie does not, he may satisfy his burden at the

summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted). *See also Anderson*, 477 U.S. at 256 (The nonmovant "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."). Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of his case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including…summary judgment proceedings." *Id.* at n.3 (citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008). "Although [o]ur summary judgment standard requires us to view the facts in the light most favorable to the non-moving party[,] it does not require us to make unreasonable inferences in favor of the non-moving party." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs*, 117 F. App'x 64, 69 (10th Cir. 2004)). While Mr. Bruce failed to file a response to the Motion for Summary Judgment, this court construes the Motion to Deny Summary Judgment as a Response, to the extent it can. To the extent the Motion to Deny Summary Judgment is not applicable (or responsive), the court deems the properly supported facts offered by Defendant Osagie as true.

*See* Fed. R. Civ. P. 56(e)(2); *Lammle v. Ball Aerospace & Techs. Corp.*, Case No. 11-cv-3248-MSK-MJW, 2013 WL 4718928, at *1 (D. Colo. Sept. 1, 2013). However, in doing so, the court has reviewed the entirety of the exhibits submitted by Defendant so as to ascertain their context. Despite Mr. Bruce's failure to file a proper response, the court may not enter summary judgment unless Defendant Osagie carries his burden under Rule 56 of the Federal Rules of Civil Procedure. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

### B.     Undisputed Material Facts

#### Plaintiff's Medical Records as they Pertain to His Ankles and Feet

The following facts are taken from Defendant's Statement of Undisputed Facts, [#176-1], which Mr. Bruce has not contested. Mr. Bruce's medical records, referred to by Defendant as Plaintiff's Bureau Electronic Medical Records ("BEMR"), reflect that the first instance since 2012 of him complaining about "problems in his lower extremities," is a complaint that his leg was broken during a use of force incident on October 23, 2013. [#176-1 at ¶ 1; #176-2 at ¶ 22; #176-3 at 72]. In July 2014, following a use of force incident, Mr. Bruce complained that ankle restraints had cut into the bone. Defendant found no sign of any such injury during a physical examination. [#176-1 at ¶ 2; #176-2 at ¶ 24; #176-4 at 138-139]. In August 2014, Mr. Bruce reported to Defendant during a sick call examination that his ankle brace was no longer effective for relieving his ankle pain. [#176-1 at ¶ 3; #176-2 at ¶ 25; #176-4 at 99]. Defendant encouraged Mr. Bruce to use his ankle brace as directed. [*Id.*; #176-4 at 101]. In September 2014, Defendant examined Mr. Bruce "following a sick call request for complaints of left ankle pain of about eight (8) months duration." [#176-1 at ¶ 4; #176-2 at ¶ 26; #176-4 at 51-52]. Mr. Bruce represented he did not know the cause of the pain, but stated the ankle brace no longer helped and he requested referral to a bone/foot specialist. [*Id.*] "At this time, a request for a

radiology consultation was submitted to assess Bruce's left ankle complaints." Defendant also encouraged Mr. Bruce to continue "use of the ankle brace for support and compression and to stretch/keep warm compress on the left ankle." [*Id.*] In September 2014, the consultation request for radiology was approved. X-rays of Mr. Bruce's left ankle were taken in October 2014 to assess his reports of chronic pain. The findings were negative. [#176-1 at ¶ 5; #176-2 at ¶¶ 28, 29; #176-4 at 381, 385]. During an unrelated sick call evaluation in November 2014, Mr. Bruce asked to see a foot specialist "for diagnosis and specialized treatment." Defendant submitted a consultation request for "prosthetics/orthotics" to determine the need for orthotics. [#176-1 at ¶ 7; #176-2 at ¶ 31; #176-4 at 5-6].

In January 2015, Defendant saw Mr. Bruce after Plaintiff requested an evaluation for "complaints of sudden painless swelling of his right ankle," which he had noticed the previous day but which led to pain on the day of the exam. [#176-1 at ¶ 8; #176-2 at ¶ 33; #176-5 at 333, 329]. Mr. Bruce denied "trauma, fever, malaise, nausea, vomiting, diarrhea, and dysuria." During the examination, Defendant noted "edema, pitting edema, swelling, decreased active range of motion, decreased range of passive motion, warm to the touch and tenderness of the right ankle." [*Id.*] Defendant also noted "2+ pitting edema elicited (R)" and "+ pitting edema (L)." [*Id.*] At this time, Defendant prescribed Mr. Bruce Spironolactone and predniSONE for the edema, ordered laboratory testing, and advised him to "follow-up at sick call as needed." [*Id.*] Defendant attests that, "[d]ue to the idiopathic nature of the edema, these tests were ordered to rule out lymphedema, protein-losing enteropathy, liver disease, and nephrotic syndrome." [*Id.*] X-rays of Mr. Bruce's right foot taken the same day were negative for bony pathology; although, the findings were noted as "abnormal, soft tissue swelling, with a notation that the tiny osseous fragment anterior to the ankle may reflect small avulsion injury." [#176-1 at ¶ 9; #176-2

at ¶ 34; #176-5 at 123, 126, 331]. "Chest x-rays were also completed to rule out pulmonary hypertension as the cause of the idiopathic edema." [*Id.*]

On February 6, 2015, Mr. Bruce was examined by a contract orthotic provider for evaluation for shoes and orthoses. The contract provider noted that Mr. Bruce had a history of sore feet and presented with moderate pronation and arch pain. He measured Mr. Bruce for shoes and took impressions for custom foot orthotics. The provider noted that he would request authorization and schedule Mr. Bruce for another appointment when the shoes were ready for fitting. [#176-1 at ¶ 10; #176-2 at ¶ 35; #176-5 at 113, 293, 311]. On February 24, 2015, chest x-rays were conducted for Mr. Bruce to "further evaluate the idiopathic edema and rule out pulmonary hypertension"; those x-rays returned negative findings. [#176-1 at ¶ 11; #176-2 at ¶ 38; #176-5 at 316].

On March 20, 2015, Mr. Bruce submitted a sick call request reporting in relevant part that his "ankles and feet [were] in pain," and asking for a "shoe pass." Defendant responded that a shoe pass would issue "upon receipt of the new custom shoes from the foot doctor." [#176-1 at ¶ 12; #176-2 at ¶ 41; #176-5 at 311]. On March 31, 2015, Defendant evaluated Mr. Bruce for reported breathing problems. Mr. Bruce had requested an EKG "due to ongoing chest pains, upper respiratory problems, trouble breathing at times, dizziness, light headedness, tightness of stomach, wheezing noises at times, coughing up specks of blood and foot/ankle swelling." [#176-1 at ¶ 13; #176-2 at ¶ 43; #176-5 at 64, 66, 292, 295]. Defendant's examination revealed "ambulation with a limp and '2+ pitting edema of both lower extremities.'" [*Id.*] At this time, Defendant ordered laboratory tests and an EKG. He noted that Mr. Bruce had had a baseline EKG a year prior, and encouraged him to "maintain adequate nutrition and fluid intake." [*Id.*]

On April 2, 2015, Mr. Bruce submitted a sick call request reporting the following: "foot split open on the side between 12:00 AM – 1:00 AM, swelling feet, bleeding, substantial and extreme pain and discomfort and can barely walk." [#176-1 at ¶ 14]. The response informed him that he was "currently on a diuretic to reduce the swelling in his lower extremities and laboratory testing was in progress to further determine the cause of the swelling." [*Id.*] He also requested an update on the custom orthotic shoes, and Defendant Osagie responded that the orthotist had not yet returned to the facility. [*Id.*; #176-2 at ¶ 44; #176-5 at 284]. Three days later, Mr. Bruce submitted a request addressed to all medical staff/health officials, reporting that his feet had been swelling for about six days and he had cut his pinky toe and he could barely walk and believed it was the result of diabetes, and asking for an update on the special orthotic shoes. [#176-1 at ¶ 15; #176-2 at ¶ 55; #176-5 at 292]. A staff member, Y. Fetterhoff, responded that staff had seen Mr. Bruce on March 31, 2015, "for this issue," and instructed Mr. Bruce "to place a sick call request asking to be tested for diabetes," and that he would receive the shoes when the orthotist delivered them. [*Id.*]

On April 9, 2015, Defendant saw Mr. Bruce for follow-up evaluation for a callus on his finger. [#176-1 at ¶ 16]. At this time, Mr. Bruce asked to be tested for diabetes and Defendant ordered laboratory testing. Defendant attests that Mr. Bruce did not report any issues or concerns with swelling and/or pain in his lower extremities, and Defendant did not observe any swelling. [#176-2 at ¶ 47]. That evening, J. Mather, RN, saw Mr. Bruce for an injury assessment following a calculated use of force action. [*Id.* at ¶ 48]. Mr. Bruce reported edema in both lower extremities, and the provider noted "slight edema in the lower extremities, R>L, chronic, not related to this incident," and advised Mr. Bruce to follow-up at sick call. [*Id.*; 176-5 at 47].

On April 15, 2015, S. Dunn, RN, saw Mr. Bruce for an injury assessment following a calculated use of force action during which he had been placed in ambulatory restraints. [#176-1 at ¶ 17]. Mr. Bruce reported pain to the posterior neck and right cheek, as well as edema in the lower extremities due to the placement of leg restraints. The nurse "noted no deformities, contusions, abrasions, punctures/penetrations, burns, lacerations, or swelling," and also noted that Mr. Bruce's "ankle/leg swelling was not a new issue, and that the leg restraints were not constrictive and no acute distress appeared to be present." [*Id.*; #176-2 at ¶ 50; #176-5 at 35-36]. On April 20, 2015, R. Huddleston, EMT, saw Mr. Bruce for an injury assessment following a calculated use of force action. [#176-1 at ¶ 18]. Mr. Bruce reported pain in both wrists, both ankles, and his lower back. Following the examination, the provider recorded no swelling, lacerations, abrasions, or contusions. [#176-2 at ¶ 51; #176-5 at 17-19].

Around this time, Mr. Bruce was transferred to the Federal Medical Center in Springfield, Missouri ("FMC-Springfield") for a forensic evaluation ordered by the court in a separate and unrelated proceeding. *See United States v. Bruce*, 14-cr-00480-WYD, [ECF No. 22] (D. Colo. Apr. 23, 2015). On May 18, 2015, M. Choudhury, M.D., evaluated Mr. Bruce for endo/lipid issues and orthopedic/rheumatology issues during a chronic care clinic held at FMC-Springfield. [#176-1 at ¶ 19; #176-2 at ¶ 60]. Dr. Choudhury noted a history of multiple aches and pain and vague complaints about Mr. Bruce's left shoulder and both ankles with regard to the orthopedic/rheumatology issues. The doctor also noted that Mr. Bruce "could not describe any specific dates, specific injuries or history of dislocation or surgeries," and that Mr. Bruce "mostly emphasized his demands for special permissions issued by previous doctors at vague times and for unknown reasons." [*Id.*] With regard to issues of swelling and foot pain, Dr. Choudhury noted that Mr. Bruce's feet "seemed normal," noting no deformities, and that his gait also

appeared normal with no limping. [*Id.*] The doctor did not note nonpitting edema or pitting edema during examination of the peripheral vascular portion. [*Id.*] The doctor ordered the following: laboratory tests, x-rays of the shoulders, ankles, and chest, a consultation for an orthopedist to evaluate Mr. Bruce's shoulders and ankles, and a consultation for general surgery for a mastectomy due to a previous recommendation that a left breast mass be removed. [*Id.*]

On June 3, 2015, T. Zongker, PAC, evaluated Mr. Bruce following a calculated use of force action. [#176-1 at ¶ 20; #176-2 at ¶ 64]. Mr. Bruce reported complaints of shoulder pain and ankle/foot pain due to previous injuries. [*Id.*] The provider noted that Mr. Bruce was not in apparent distress and pain medication was already available to him. He checked the restraints and noted "pulses palpable in all four extremities." [*Id.*; #176-6 at 117-119].

On June 12, 2015, C. Cole, RN, saw Mr. Bruce during sick call for various complaints, including eye issues and pain and discomfort in his feet. [#176-1 at ¶ 21; #176-2 at ¶ 65]. Mr. Bruce requested ankle braces, personal shoes, and orthotics. Nurse Cole directed Mr. Bruce to elevate his legs and stated that he would place a sick call request for him. [*Id.*] R. Tolver, PA-C, saw Mr. Bruce later that day for shoulder pain and bilateral foot pain. [*Id.*] Mr. Bruce reported experiencing intermittent lower leg edema and "slight edema" at that time. [*Id.*] The provider advised that he would request an orthotics consultation for evaluation of Mr. Bruce's feet for insoles and soft shoes, but Mr. Bruce stated that he would be leaving the institution in less than 30 days and would address the situation in the future. [*Id.*; #176-6 at 76-92].

On July 2, 2015, following his return transfer to ADX, Mr. Bruce reported that a pair of ankle braces was missing; he was issued a new pair of ankle braces the same day. [#176-1 at ¶ 22; #176-2 at ¶ 70; #176-6 at 69]. On July 11, 2015, Mr. Bruce submitted a request to medical records staff requesting the status of the custom orthotic shoes, stating that he could not walk due

to "extreme pain and discomfort," and that he had fallen several times due to "the pain and discomfort coming on sharply/out of nowhere." [#176-1 at ¶ 23; #176-2 at ¶ 71; #176-6 at 432]. Y. Fetterhoff responded to Mr. Bruce that his request had previously been answered multiple times. [*Id.*] On July 12, 2015, Mr. Bruce submitted a request addressed to the medical records department requesting the custom shoes and reporting: "feet is in extreme and substantial pain and discomfort at times I can't even walk like on 7/10/2015 for over 6-hours I couldn't walk due to the said pain." [*Id.*; #176-2 at ¶ 72; #176-6 at 433]. Y. Fetterhoff informed Mr. Bruce that he would receive his custom shoes as soon as the orthotics contractor was cleared to return to the facility. [*Id.*] On July 16, 2015, Defendant issued Mr. Bruce a new pair of insoles and noted he was awaiting custom shoes from the orthotist. [#176-1 at ¶ 24; #176-2 at ¶ 73; #176-6 at 54].

On September 10, 2015, the orthotics consultant returned to ADX and evaluated Mr. Bruce with the custom shoes/orthotics. [#176-1 at ¶ 25; #176-2 at ¶ 76; #176-7 at 135]. He noted that Mr. Bruce stated the shoes "felt good" and was comfortable with the fit. [*Id.*] The provider noted the fit appeared appropriate, and advised Mr. Bruce to follow up as needed. [*Id.*] Mr. Bruce received the custom shoes. [*Id.*; #176-7 at 53, 135]. On September 25, 2015, Defendant renewed Mr. Bruce's prescription for Naproxen for the treatment of ankle/foot pain in the joint. [#176-7 at 39-41].

On October 1, 2015, Defendant saw Mr. Bruce for complaints regarding breathing problems, swollen ankles, left shoulder pain, and calluses on his fingers. [#176-1 at ¶ 27; #176-2 at ¶ 78]. Mr. Bruce requested lab work, an MRI, and accommodations in order to write. [*Id.*] Defendant noted that Mr. Bruce had been observed cleaning the observation cell during the interview and engaging in regular activities and cleaning without grimacing, as well as talking, joking, and smiling without difficulty and "did not appear to be in obvious distress." [*Id.*]

Defendant thus informed Mr. Bruce that "there was no indication for new lab work or an MRI at this time." [*Id.*; #176-7 at 37-38].

On November 5, 2015, Mr. Bruce submitted a request addressed to Defendant's attention reporting pain in his shoulder, incorrect prescription eyeglasses, and that his "feet (sp?) is deteriorating have holes in it, in extreme pain and discomfort sometimes. Can't walk longer than one minute, acute swelling in feet and ankles and legs." [#176-1 at ¶ 28; #176-7 at 128]. On November 9, 2015, Mr. Bruce submitted a request to health services, reporting that the custom shoes provided by the specialist had not alleviated the chronic/acute foot pain, observing that the custom shoes did not have ankle support. [*Id.*; #176-7 at 122]. He complained that the orthotist lied to him by stating no shoes with ankle support were in stock at the time of the consultation. Staff member Y. Fetterhoff responded that orthotics for hightop shoes are difficult to obtain, and advised Mr. Bruce to let health services know if there is a problem with the orthotics so that the facility could notify the consultant. [*Id.*]

On December 16, 2015, Mr. Bruce complained about severe pain in his left ankle following a use of force incident. [#176-1 at ¶ 29; #176-2 at ¶ 84]. The provider, C. Olguin, RN, noted in an extensive summary that Mr. Bruce was hypersensitive to his left ankle and appeared to react even when his ankle was not being touched by the provider. Nurse Olguin also noted that no objective measure confirmed Mr. Bruce's report of ankle pain. Finally, the nurse noted that she was able to examine Mr. Bruce's ankle, including palpitation, without any extreme reaction from him when he was engaged with other prison staff. [*Id.*; #176-8 at 187-191]. The next day, Mr. Bruce complained of ankle pain registering at 10 on a 1 through 10 scale, and stated that he could not walk due to pain in his left ankle. [*Id.* at ¶ 30; #176-2 at ¶ 86; #176-8 at 181-183]. The evaluating provider observed no swelling, deformity, abrasion, or bruising in Mr.

Bruce's ankle. Mr. Bruce's restraints were then removed. [*Id.*] On December 20, 2015, R. Huddleston, EMT, saw Mr. Bruce for an injury assessment following a calculated use of force action. Mr. Bruce was observed as having a laceration approximately 5 mm long on the upper part of his right ankle. [#176-1 at ¶ 31; #176-2 at ¶ 89; #176-8 at 168-169].

On December 29, 2015, Defendant saw Mr. Bruce for an injury assessment following a calculated use of force action during which he had been placed in four-point restraints. [#176-1 at ¶ 32; #176-2 at ¶ 100; #176-8 at 2961-2964] Mr. Bruce stated that he had a bruise on his ankle due to the calculated use of force. After an examination, Defendant did not note any marks, abrasions, contusions, or lacerations on Mr. Bruce's wrists or ankles. [*Id.*]

On July 29, 2016, L. Williams, EMT-P, saw Mr. Bruce for an injury assessment following a calculated use of force. [#176-1 at ¶ 33]. Mr. Bruce complained that his feet hurt due to walking around without medical shoes and inserts; however, staff noted that Mr. Bruce had been able to ambulate without difficulty during the use of force. [*Id.*; #176-2 at ¶ 140; #176-9 at 81-82]. On September 27, 2016, Mr. Bruce was again seen by L. Williams, EMT-P, for an injury assessment following a calculated use of force. [#176-1 at ¶ 34; #176-9 at 8-9]. Mr. Bruce complained of pain in his wrists and ankles but the provider noted no obvious injuries were visible. [*Id.*]

On October 4, 2016, Defendant saw Mr. Bruce during sick call, where he complained of left shoulder pain and right ankle and foot pain due to walking on concrete without shoes. [#176-1 at ¶ 35; #176-2 at ¶ 165]. Mr. Bruce reported sporadic swelling of his ankle and foot and a "pins and needles" feeling, and requested examination by a foot specialist. He was observed favoring his left foot during ambulation, and he experienced moderate tenderness in his right ankle upon palpitation. Defendant recommended a consultation with an orthopedic surgeon

for evaluation of Plaintiff's ongoing complaints of shoulder pain. Defendant did not find that Mr. Bruce's complaints of ankle pain warranted consultation with a specialist. [*Id.*; #176-9 at 4-6]. One month later, on November 4, 2016, Defendant saw Mr. Bruce during sick call. [#176-1 at ¶ 36]. Mr. Bruce complained of experiencing ankle pain he described as a 7 on a scale of 10. [*Id.*; #176-10 at 46-48]. Upon examination, Defendant found no edema in Mr. Bruce's lower extremities, and noted that he ambulated without difficulty. [*Id.*] On November 18, 2016, Defendant provided Mr. Bruce with a new ankle brace. [#176-1 at ¶ 37; #176-10 at 42]. On November 22, 2016, Defendant again saw Mr. Bruce for ankle pain. [#176-1 at ¶ 38]. Defendant noted that Mr. Bruce had no signs of edema in his lower extremities. [*Id.*; #176-10 at 38-39]. On December 12, 2016, Defendant evaluated Mr. Bruce for complaints of substantial pain in his feet that interfered with his ability to walk. [#176-1 at ¶ 39; #176-10 at 5-6]. Defendant did not note any sign of edema in Mr. Bruce's lower extremities. [*Id.*]

Plaintiff's Interaction with Medical Staff

Defendant Osagie attests that the BOP has a variety of policies and procedures for certain situations that require medical staff to evaluate or conduct wellness checks on inmates. [#176-1 at ¶ 40]. He describes general policies and procedures relating to (1) sick call procedures; (2) Chronic Care Clinic ("CCC") procedures; (3) Prison Rape Elimination Act ("PREA") policies; (4) medical and administrative management of inmates who engage in hunger strikes; (5) suicide prevention programs; and (6) "restraint checks," when inmates have been placed in restrictive restraints. [*Id.*; #176-2 at ¶¶ 3-12]. Defendant states that Mr. Bruce is often in contact with medical staff due to these six categories of protocols. [*Id.* at ¶ 41; #176-2 at ¶ 7]. On February 23, 2015, Defendant saw Mr. Bruce for an injury assessment, at which time Plaintiff reported swelling of his right hand. [#176-1 at ¶ 42]. Following an examination, Defendant noted no

evidence of physical trauma or injury, swelling, cuts, abrasions, or contusion. Mr. Bruce did not report "any issues with his ankles/feet and/or swelling/pain in conjunction with his lower extremities at this time." [*Id.*; #176-2 at ¶ 37]. Defendant saw Mr. Bruce later that day for another injury assessment and noted during that evaluation that Mr. Bruce was ambulating without difficulty. [*Id.*].

On March 18, 2015, Defendant evaluated Mr. Bruce for other issues. [#176-1 at ¶ 43]. A physical evaluation revealed no physiological compromise, and Mr. Bruce did not report issues or concerns with swelling or pain in his lower extremities at that time, nor did Defendant observe any swelling. [*Id.*; #176-2 at ¶ 40; #176-5 at 95-97]. Defendant ordered laboratory testing to fully assess Plaintiff's condition due to Plaintiff's participation in a then-recent hunger strike. [*Id.*] Shortly thereafter, Mr. Bruce was transferred from ADX to FMC-Springfield.

On June 12, 2015, FMC-Springfield issued "Nursing Discharge Instructions" for the return transfer of Mr. Bruce to ADX. [#176-1 at ¶ 46]. This evaluation listed the following "Diagnosis/Medical Findings" for Mr. Bruce: chronic gingivitis, hyperlipidemia, hypermetropia, dermatitis, and sinusitis. [*Id.*; #176-2 at ¶ 66; #176-6 at 474]. The evaluation did not include issues related to edema or swelling of the lower extremities. [*Id.*] The evaluation reported Plaintiff's "Physical Status" as ambulatory. [*Id.*]

Between December 30, 2015 and May 19, 2016, Mr. Bruce had 34 documented encounters with health services staff, and did not register a complaint about swelling in his lower extremities or pain or discomfort in his feet or ankles during any of these exchanges. [#176-1 at ¶ 47; #176-2 at ¶¶ 102-135; #176-8 at 1-130]. Between July 30, 2016 and September 26, 2016, Mr. Bruce had 19 documented encounters with health services staff, and did not register a complaint about swelling in his lower extremities or pain or discomfort in his feet or ankles

during those exchanges.  [#176-1 at ¶ 48; #176-2 at ¶¶ 142-160; #176-9 at 11-76].[4]  Mr. Bruce's BEMR demonstrates that he also routinely encounters medical staff twice a day during "pill line," when medications are administered to inmates.  [#176-1 at ¶ 49].  Mr. Bruce is prescribed a number of medications, and thus health services staff visit his cell during the day as well.  [*Id.*; #176-8 at 214-228].

Knowledge Attributable to Defendant Osagie

Defendant Osagie attests that it is his "understanding that the swelling in [Mr. Bruce's] ankles and/or feet is a chronic issue and periodically recurs."  [#176-1 at ¶ 54; #176-2 at ¶ 15]. He further attests that medical staff "have administered diagnostic tests to rule out certain conditions in an attempt to diagnose Bruce's condition."  [#176-1 at ¶ 55; #176-2 at ¶ 16].  This included taking an x-ray of Mr. Bruce's ankle, which revealed an old ankle fracture.  [*Id.*] However, Defendant represents, he and the health staff "have not been able to determine a specific cause for Bruce's edema, and therefore, at the current time, the diagnosis of the swelling in Bruce's ankles and feet is idiopathic, or without a specific cause."  [*Id.*]  Mr. Bruce is currently prescribed Triamterene, "a medication intended to reduce swelling in the lower extremities."  [#176-1 at ¶ 56; #176-2 at ¶ 17].  Mr. Bruce has also received multiple ankle braces at his request, including a new brace that was issued as recently as November 2016. [#176-1 at ¶ 57; #176-2 at ¶ 18; #176-10 at 40].  Defendants attests that he does "not believe that the issue regarding swelling in Bruce's ankles and/or feet are conditions that are life-threatening or could result in lifelong complications," or that "the swelling in Bruce's ankles and/or feet have ever presented these risks."  [#176-1 at ¶ 58; #176-2 at ¶ 19].

---

[4] However, Mr. Bruce's lack of complaints with respect to several of these encounters may be attributable to the circumstances giving rise to them, such as when Mr. Bruce "was seen for a restraint check while in four-point restraints." *See* [#176-2 at 30-31, 36-38].

### C.    Legal Conclusions

As an initial matter, I agree with Defendant's characterization of Plaintiff's sole remaining claim as one for injunctive relief asserted against Defendant in his official capacity. *See* [#176 at 2-3 (citing #42 at 6)].   The Amended Complaint in which the United States identifies a potential claim for damages against Defendant in his personal capacity, [#176 at 4 (citing #30 at 3, 20)], was subject to the court's Order to Show Cause, dated March 17, 2015, [#33], which clearly stated "Plaintiff filed the Amended Complaint on February 12, 2015, **which [is] not [] the operative pleading for this Order**."   [*Id.* at 1 (emphasis added)].   The court derived the existing claim from a different document, namely, Mr. Bruce's Motion for TRO/Preliminary Injunction, in which he asked the court to enjoin Defendant Osagie from, essentially, abdicating his responsibility as "primary contact" for providing medical treatment and referrals to specialists, alleging that Defendant was disregarding his "sick call requests" and thus subjecting him to "unnecessary and wanton infliction of pain," relating to the swelling in his ankles and feet.   [#35 at 1, 3].   Indeed, as this court laid out in its Order dated March 3, 2016, the Second Amended Complaint is non-operative [#78 at 3], and the only viable claim is derived from the Motion for TRO/Preliminary Injunction at page 3, paragraph 4, which contains neither a claim against Defendant Osagie individually nor a demand for damages.   [*Id.* at 4 (citing #35)]. Accordingly, I analyze the claim as one for prospective injunctive relief against Defendant Osagie acting in his official capacity, and arising under the Eighth Amendment and either 28 U.S.C. §§ 1331 and/or 1361.[5]   *See Simmat v. United States Bureau of Prisons*, 413 F.3d 1225,

---

[5] Having defined the contours of the claim as seeking only prospective injunctive relief, I need not address Defendant's arguments in the alternative regarding *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403, U.S. 388 (1971) [#176 at 4-13], which recognizes an implied cause of action for damages and arguably injunctive relief against federal officers alleged to have acted in their individual capacity in violation of certain constitutional rights. *See*

1236 (10th Cir. 2005). However, for the reasons stated below, there is no evidence in the record that Defendant acted with deliberate indifference.[6]

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted). The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Prison officials may be liable for an Eighth Amendment violation for "indifference…manifested…in their response to the prisoner's needs or by…intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014).

"The test for constitutional liability of prison officials involves both an objective and a subjective component." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and citation omitted). First, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Defendant concedes for the purpose of the Motion for Summary Judgment that Mr. Bruce has satisfied the objective component. [#176 at 10, n.2].

Second, under the subjective component, the prisoner must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at

---

*Carlson v. Green*, 446 U.S. 14, 18 (1980). *See also Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1228 & n.1, 1231 (10th Cir. 2005).

[6] For this reason, I similarly decline to reach Defendant's assertion of qualified immunity, to the extent the court interprets the construed claim as asserted against Defendant in his individual capacity.

104 (internal quotation and citation omitted). The Tenth Circuit recognizes two types of conduct constituting deliberate indifference. The first occurs when a medical professional fails to properly treat a serious medical condition; the second occurs when a prison official prevents an inmate from receiving treatment or denies him access to medical personnel capable of providing treatment. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000) (internal citations omitted). A prison health official who serves "'solely…as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill the gatekeeper role.'" *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211. The subjective standard requires a state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837) (internal quotations and further citation omitted). "'[A]n inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Estelle,* 429 U.S. at 105–06). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Self*, 439 F.3d at 1231 (internal quotations omitted).

The record before me provides no basis on which to conclude that a reasonable juror could find that Defendant Osagie acted with the reckless disregard necessary to satisfy the subjective component of an Eighth Amendment violation, i.e., that Defendant deliberately prevented Mr. Bruce from receiving recommended treatment or denied him access to medical personnel capable of evaluating the need for treatment. *See Estate of Booker*, 745 F.3d at 429. Defendant's declaration and the BEMR demonstrate that Defendant has addressed complaints

relating to Plaintiff's ankle and foot issues on at least 20 separate occasions since 2013. *See* [#176-1 at ¶¶ 1-4, 7-9, 12-14, 22, 24, 26, 27, 32, and 35-39]. Plaintiff has been prescribed Naproxen for pain and Triamterene for the swelling in his ankles and feet. *See, e.g.,* [*id.* at ¶¶ 13, 26, 56]. Mr. Bruce received a pair of custom orthotic shoes on September 10, 2015, [*id.* at ¶ 25], and received a new ankle brace in November 2016. [*Id.* at ¶ 37]. X-ray results on Plaintiff's ankle have been negative. [*Id.* at ¶¶ 5, 55]. Chest x-rays for pulmonary hypertension were also negative, [*id.* at ¶ 11], and other laboratory tests have ruled out lymphedema, protein-losing enteropathy, liver disease, and nephrotic syndrome. [*Id.* at ¶ 8].

The uncontested material facts, which are substantially supported by Plaintiff's BEMR, demonstrate that Defendant Osagie has neither disregarded Plaintiff's sick call requests nor interfered with Plaintiff's access to other health care staff and specialists. Furthermore, as Defendant emphasizes in the Motion, he does not believe that the unidentified condition that causes the complained-of swelling is or has ever been life-threatening. Accordingly, and notwithstanding the concession regarding the objective prong, he has not consciously disregarded a substantial risk of serious harm because he has never believed that the swelling could cause serious harm. This opinion finds support in the record, for instance, the Nursing Discharge Instructions from FMC-Springfield did not include edema or swelling of extremities in a list of Mr. Bruce's medical conditions. At most, Mr. Bruce appears to disagree with the course of treatment, which is not a cognizable Eighth Amendment violation. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Accordingly, I find that the undisputed facts foreclose a claim for deliberate indifference as to Defendant Osagie, and thus I respectfully **RECOMMEND** that the Motion for Summary Judgment be **GRANTED**.

## II.     The Motion to Amend

As discussed above, Mr. Bruce filed a Motion to Amend approximately three weeks after Defendant filed his Motion for Summary Judgment. *See* [#176, #181]. Mr. Bruce argues that with the assistance of fellow inmates, he "has just learned how to amend a complaint," and that his proposed amendments relate back to the date of the original pleading, filed in July 2014. [#181 at 1]. Plaintiff asserts that his proposed amendments assert "claims…that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading," and that he wishes to add claims against Defendant Osagie. [*Id.* at 2].

Defendant Osagie argues that allowing an amendment of the pleadings at this late date, after the close of discovery and after he has filed a Motion for Summary Judgment, would be prejudicial, and, considering the filing restrictions applicable to Plaintiff under § 1915, Mr. Bruce must file a new lawsuit and pay those filing fees in order to assert new claims. [#192].

In Reply, Plaintiff asserts that § 1915 does not require him to file a new case when he seeks to supplement an operative pleading under Federal Rule of Civil Procedure 15(d), and that, pursuant to Federal Rule of Civil Procedure 18, he may bring in one action multiple claims "against a party arising from the same factual situation." [#195 at 2]. Plaintiff also appears to suggest that his proposed claims reflect that he is in imminent danger of physical harm. [*Id.*] Finally, Plaintiff asks the court to reopen discovery. [*Id.* at 6]. He states that he "is not familiar with the summary judgment procedures and had several witnesses…who could testify that they witnessed or observed the Plaintiff's legs, ankles and/or feet swelled up abnormally during the course of conversing with the plaintiff," and he does "not know the formal procedure of obtaining witnesses." [*Id.*] Plaintiff also represents that he received a printed version of his CDR on February 14, 2017, [*id.* at 4], but only recently, in mid-March, learned the BOP code for

use of force team incidents, which now allows him to identify in his CDR on what dates and in what specific use of force incidents Defendant Osagie participated or was present.

### A.    Applicable Law

Under Tenth Circuit law, courts employ a two-step analysis in determining whether to allow a party to amend the pleadings after the deadline established by the Scheduling Order has passed.  First, the court considers whether the moving party demonstrates good cause pursuant to Rule 16(b) of the Federal Rules of Civil Procedure.  *Gorsuch Ltd. B.C. v. Wells Fargo Nat'l Bank,* 771 F.3d 1230, 1242 (10th Cir. 2014).  If the moving party can demonstrate good cause, the court then weighs whether the amendment should be allowed pursuant to Rule 15(a).  *Id.*

Despite this court's guidance in the order setting pre-trial deadlines, Plaintiff moves under Rule 15 only, and Defendant in his Response relies primarily on the argument that amendment at this date will cause him prejudice, which is an argument pertinent to a Rule 15(a) analysis. *Colo. Visionary Acad. v. Medtronic, Inc.,* 194 F.R.D. 684, 687 (D. Colo. 2000) ("Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment.").  In the Minute Order setting the Pretrial Schedule, entered on July 26, 2016, this court stated that "[g]iven the duration of this matter and the multiple amendments by Plaintiff to date, any proposed joinder of parties or amendments of pleading must satisfy both the good cause standard under Rule 16(b) and the standard for amendment under Rule 15(a)."  [#124 at 1].  In consideration of Plaintiff's *pro se* status, and so as to avoid any prejudice that could result from the Parties' misapprehending this court's instruction, the undersigned will apply only a Rule 15 analysis to the Motion to Amend. *See Aronstein v. Thompson Creek Metals Company, Inc*., No. 15-cv-00204-RM-NYW, [ECF No. 162] (D. Colo.

Sept. 15, 2016) (declining to find that Rule 16(b) applied to a motion to amend where scheduling order included language that any motion to amend would be subject to a Rule 15(a) and Rule 16(b) analysis, but omitted an actual date by which the parties could amend, and setting the date of the order as the motion for amendment or joinder). However, the Parties are advised that for the purpose of moving forward with this case, the deadline by which to amend pleadings or join parties is today, **May 23, 2017**.

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, the court may refuse leave to amend upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1365 (10th Cir. 1993). The non-moving party bears the burden of showing that the proposed amendment is improper. *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc.,* 175 F.3d 848, 859 (10th Cir. 1999). Whether to allow amendment is within the trial court's discretion. *Burks v. Oklahoma Publ'g Co.,* 81 F.3d 975, 978–79 (10th Cir. 1996).

### B.    Application

Mr. Bruce asserts the following new allegations in his proposed amended complaint. He was transferred to ADX on June 24, 2011, and he suffers from "chronic/acute and substantial pain and discomfort in his ankles and feet for which he was prescribed and issued ankle braces…to help alleviate or decrease the pain and discomfort." [#181-1 at 4]. On April 19, 2013, a "use of force cell extraction team," was "assembled upon the Plaintiff," and caused him "serious physical injury," including pain in his left ankle. [*Id.*] On April 23, 2013, in response to a sick call request from Plaintiff resulting from the April 19 incident, Defendant Osagie told

Plaintiff that he was "a disgrace, and that he would not accept any of the plaintiff's sick call requests." [*Id.*] Despite numerous requests for treatment for the injuries resulting from the April 19 incident, Defendant Osagie refused "for over 15 months" to examine Plaintiff, which further exacerbated Plaintiff's injuries and caused pain that interfered with daily activities such as walking. [*Id.* at 6]. Between April 2013 and August 2014, Plaintiff "suffered reoccurring injuries to his left ankle and foot during the course of use of force teams" used against him. [*Id.*] He "repeatedly submitted…request slips to Defendant Osagie or other health care services staff to give to Defendant Osagie…requesting to be examined by a foot specialist." [*Id.* at 7]. For example, he submitted sick call requests to Nurse C. Olguin on July 27, 2014 and to Defendant Osagie on August 4, 2014 and September 29, 2014. [*Id.*] Defendant Osagie denied Plaintiff's requests for over three months, "resulting in the plaintiff's ankles and feet unexpet[edly] swelling up abnormally, accompanied by substantial and chronic pain and discomfort forcing plaintiff to fall and crawl around upon the floor of his cell." [*Id.*]

Plaintiff alleges that Defendant Osagie visited him on an unspecified date and observed the swelling in Plaintiff's ankle and foot and told Plaintiff to "invert his ankle/foot." [*Id.* at 8]. When Plaintiff responded that he could not invert his ankle or foot, "Defendant Osagie started antagonizing the plaintiff, repeatedly telling the plaintiff to invert his foot and to stop playing games." [*Id.*] Defendant Osagie then walked away from Plaintiff when he would not invert his foot. [*Id.* at 7-8]. Shortly thereafter, Lieutenant Robert Martin ordered a wheel chair and had Plaintiff wheeled to the health services department to see Defendant Osagie. [*Id.* at 8]. Defendant Osagie took Plaintiff's foot and "started intentionally bending, twisting, and inverting the…foot/ankle after Plaintiff told him he couldn't move it." [*Id.*] Mr. Bruce represents he experienced a level of pain of "8 ½ to a 9" during this visit.

On January 30, 2015, Defendant Osagie conducted a medical health evaluation for Mr. Bruce, at which time he informed Plaintiff that his x-ray results from a few days earlier "revealed that the Plaintiff had or have [sic] fragments of chip bone in his feet/ankles which is the reason why both his ankles and feet are extremely swollen and in extreme pain and discomfort." [*Id.* at 10]. Mr. Bruce again complained in person to Defendant Osagie on March 31, 2015, identifying pain in his ankles and feet and issues with breathing. [*Id.* at 11]. Defendant Osagie "told the plaintiff big deal he's busy," and walked away. [*Id.*]

Mr. Bruce was thereafter transferred to FMC-Springfield for a "court-ordered forensic evaluation." [*Id.* at 12]. On June 15, 2015, when he returned to ADX, certain unnamed corrections officers confiscated his ankle braces. [*Id.*] Mr. Bruce asked for replacement ankle braces and his request was forwarded to Defendant Osagie, who refused it, stating that Plaintiff "was responsible for the loss or destruction of his ankle braces and that he should learn to take or accept responsibility for his own actions and not blame others." [*Id.*] Mr. Bruce thereafter "started causing minor institutional disruption out of frustration, stating that Defendant Osagie's refusal to provide him with replacement ankle braces were the cause." [*Id.* at 13]. Plaintiff alleges that "several custody supervisors (Lieutenants) intervened in the matter speaking to Defendant Osagie regarding Plaintiff's requests for replacement ankle braces," and that Defendant Osagie "finally provided the Plaintiff with a replacement pair on July 2, 2015." [*Id.*] Thereafter, Mr. Bruce continued to complain about swelling and pain in his feet and ankles to Defendant Osagie, who "disregarded" Plaintiff and "never provided Plaintiff with any type of medical treatment for his feet." [*Id.* at 13-14]. To date, Mr. Bruce's "ability to walk is frequently prevented" by swelling and pain, and he alleges that Defendant refuses to provide "effective pain medication such as: Tylenol-x3 and/or Gabapentin, custom high-top

shoes/orthotics, and a walking cane or wheel chair." [*Id.* at 14-15]. Finally, Mr. Bruce alleges that he has asked Defendant Osagie for these remedies on a number of occasions, including but not limited to June 23, 2013, November 18, 2013, July 27, 2014, August 4, 2014, and September 24, 2014. [*Id.* at 15].

Mr. Bruce asserts five separate causes of action for deliberate indifference in violation of his Eighth Amendment rights on the basis of these proposed allegations. *See* [*id.* at 16-20]. Those claims are essentially variations or alternate theories of the current, operable claim and specify that Defendant Osagie: (1) repeatedly denied and/or delayed treatment for the swelling; (2) intentionally prescribed ineffective courses of treatment, such as "steroid injection and nonsteroidal anti-inflammatory drugs"; (3) repeatedly denied and/or delayed access to "medical personnel qualified to exercise judgment or with the necessary specialized expertise in regards to chronic/acute pain and discomfort of ankles and feet"; (4) repeatedly denied and/or delayed Plaintiff's requests for custom shoes, a walking cane, and a wheel chair; and (5) "antagoniz[ed] the plaintiff [by] intentionally bending, twisting, and inverting the Plaintiff's extremely swollen and in extreme pain and discomfort ankle and foot after Plaintiff had notified defendant that he could not move it." [*Id.*]

As an initial matter, I find that the Motion to Amend is more appropriately assessed under Rule 15(a) than Rule 15(d). The operative claim is derived from Mr. Bruce's Motion for TRO/Preliminary Injunction filed April 9, 2015, *see* [#35, #42]; therefore, the Motion for TRO/Preliminary Injunction is the "pleading" Plaintiff seeks to amend or supplement. Almost all of the proposed allegations occurred prior to April 9, 2015, and thus by definition of the Rules, Plaintiff seeks to amend rather than supplement. *See* Fed. R. Civ. P. 15(d) (supplemental pleadings are those which set forth "transactions or occurrences or events which have happened

since the date of the pleading sought to be supplemented"). In any event, and to the extent Plaintiff wishes to add allegations concerning events that occurred after April 9, 2015, courts in the Tenth Circuit apply the same standard governing Rule 15(a) motions to amend to Rule 15(d) motions to supplement. *See Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005); *Southwest Nurseries, LLC v. Florists Mut. Ins., Inc.,* 266 F. Supp. 2d 1253, 1256 (D. Colo. 2003) ("The court should apply the same standard for exercising its discretion under Rule 15(d) as it does for deciding a motion under Rule 15(a).").

Ultimately, I find that amendment is not appropriate on the basis of undue delay and futility. First, Plaintiff had ample opportunity to amend in a timely manner and failed to do so. After he initiated this action, on July 24, 2014, the court ordered him twice to amend his complaint. *See* [#5, #12]. On November 14, 2014, the court dismissed the action for Plaintiff's failure to comply. [#22]. The court subsequently granted Plaintiff's motion to reconsider, [#27, #28], after which, on February 12, 2015, Plaintiff filed another amended complaint. [#30]. Plaintiff filed the Motion for TRO/Preliminary Injunction two months later. Approximately one year passed between the commencement of this action and when the court ordered the case drawn to Judge Moore and the undersigned. Mr. Bruce has known all along of the incidents and events comprising the proposed allegations because he was a party to them. He fails to explain why he has waited until now, approximately two years after he filed the Motion for TRO/Preliminary Injunction and the court ordered the action reassigned, to add those allegations. He asserts only that he "has just learned how to amend a complaint." [#181 at 1]. That assertion is belied, however, by his many attempts throughout this litigation to amend his claim. *See, e.g.,* [#86, #87, #103]. The court denied those motions because each one amounted to adding other defendants or unrelated allegations and claims, which the court found was impermissible under §

1915.  *See* [#90, #117].  The court has always given Mr. Bruce's filings a liberal construction and discerned to the best of its ability the relief Mr. Bruce sought.  Thus, I am not persuaded that Mr. Bruce was unable to assert the proposed allegations before now.  *See Frank*, 3 F.3d at 1366 ("Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial") (citation omitted).

Furthermore, I find that the amendment would be futile.  As discussed above, Defendant Osagie's declaration and the accompanying medical records foreclose a finding that Defendant acted with deliberate indifference to the swelling in Plaintiff's ankles and feet.  The proposed allegations and new theories of liability would not affect this conclusion because they are either contradicted by the record, *see Anderson*, 477 U.S. at 256 (the nonmovant "may not rest upon mere allegation"), or, viewed within the context of the entire record, do not suggest that Defendant acted with the requisite subjective intent.  *See Watson v. Beckel*, 242 F.3d 1237, 1239–40 (10th Cir. 2001) (observing that a court may dismiss a motion to amend if amendment is futile, *i.e.*, the amended complaint would be subject to dismissal for any reason).  Therefore, I respectfully **RECOMMEND** that the Motion to Amend be **DENIED** for untimeliness and futility.[7]

---

[7] Given this Recommendation, I do not address Defendant's arguments that the PLRA requires Plaintiff to assert the proposed claims in a new lawsuit.

### III.    The Motion to Deny Summary Judgment and the Motion to Compel

The Motion to Deny Summary Judgment asks the court to do precisely as the title indicates and asks in the alternative for additional time to respond to the Motion for Summary Judgment.  As a basis for denying Defendant's Motion, Plaintiff alleges that several BOP officers, other than Defendant Osagie, impeded his ability to view his CDR by, essentially, rendering the room in which he was required to sit to view the CDR so unbearable that he was unable to stay long enough to meaningfully review the discovery materials.  These allegations also served as the basis for Plaintiff's November 7, 2016 Motion to Compel, [#149], which this court denied. *Compare* [#193] *with* [#149]; *see* [#172].  Plaintiff now describes conduct that occurred between October 2016 and February 2017.  With respect to the events that occurred prior to November 28, 2016, the discovery cutoff, this court refers to its Order on the earlier Motions to Compel, in which it found that Mr. Bruce had not provided authority, and the court knew of none, to support compelling Defendant to make the CDR available for inspection under conditions as specified by Mr. Bruce.  *See* [#172 at 8-10].  With respect to the events as described by Mr. Bruce occurring after November 28, the discovery period was then closed.

I nonetheless address Mr. Bruce's request for additional time as follows.  The original response deadline was January 27, 2017.  Mr. Bruce did not file a response by that date.  At no point has he explained his failure to file a response, but rather he insinuates in the Motion to Deny Summary Judgment and Motion to Compel that BOP officers interfered with his efforts to submit filings.  *See, e.g.,* [#193 at 5].  He states that his personal and legal property were confiscated, but acknowledges the property was later returned; and the documents that were

taken did not include a copy of the Motion for Summary Judgment. *See* [*id.* at 13].[8] Mr. Bruce argues that beginning on January 11, 2017, BOP officers denied him access to his "Discovery CD Titled Medical Records," which materials are "critical and/or essential to him filing a response to Defendant Osagie's Motion for Summary Judgment." [#193 at 16-18]. He also represents that, as a result of the actions of ADX staff as he describes in 125 paragraphs in the Motion and which are summarized in small part here, he has "been unable to engage in discovery, review his discovery materials, and prepare or draft a response to [the Motion for Summary Judgment]." [#193 at 21]. However, the discovery period began, at the latest, on July 26, 2016. *See* [#124]. Counsel for Defendant represented to the court on October 21, 2016 that the Parties had worked out all discovery issues. *See* [#144]. And, while Mr. Bruce took issue with the conditions in which he was made to view the CDR, there is no dispute that the material was made available to him. In addition, this court put Mr. Bruce on notice with its Order dated January 5, 2017 that it would not compel Defendant to make the CDR available under the conditions Mr. Bruce requested, and therefore would not *sua sponte* extend the November 28, 2016 discovery deadline. *See* [#172]. Significantly, Mr. Bruce filed the Motion to Amend on January 26, 2017, one day before the response to the Motion for Summary Judgment was due. *See* [#181]. He gave no mention in the Motion to Amend to his response, such as his inability to file a timely response or his desire for additional time to prepare a response. Nonetheless, on January 30, 2017, this court *sua sponte* extended the response deadline to February 27, 2017. *See* [#183]. Mr. Bruce did not file a response or any other submission, such as a motion for more

---

[8] This court notes that Mr. Bruce asserts various types of allegations in the Motion to Deny Summary Judgment that suggest his belief that certain BOP officers have violated his First Amendment right to access the courts and/or his Eighth Amendment rights regarding conditions of confinement. This court takes no position on whether these allegations could support a colorable claim, but reminds Mr. Bruce that he would need to file a separate lawsuit in order to assert them.

time, until March 22, 2017, when he filed the Motion to Deny Summary Judgment. While the events Mr. Bruce chronicles in his Motion to Deny Summary Judgment are without question unfortunate,[9] I nonetheless find that he received ample opportunity to engage in discovery and fashion and file a response to the Motion for Summary Judgment. Mr. Bruce has not demonstrated good cause for the court to either reopen and extend the discovery period or extend his deadline to respond to the Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, this court respectfully **RECOMMENDS** that:

(1)     Defendant's Motion for Summary Judgment [#176] be **GRANTED**;

(2)     Plaintiff's Motion to Amend [#181] be **DENIED**;

(3)     The Motion to Deny Summary Judgment [#193] be **DENIED**; and

(4)     The court enter judgment for Defendant Osagie and against Plaintiff Antoine Bruce.[10]

---

[9] Mr. Bruce describes escalating friction between himself and BOP officers over the condition of the viewing room and his access to the discovery materials, which culminated in his setting fire to his cell on January 5, 2017 in an attempt at suicide, and ultimately to staff placing him in "4-point" ankle and wrist restraints attached to a metal-frame bed for over 72 hours. *See* [#193 at 7-12].

[10] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 E. 30th St., Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application

In addition, **IT IS ORDERED** that the Motion to Compel [#197] is **DENIED**.

DATED: May 23, 2017                    BY THE COURT:

                                       s/ Nina Y. Wang
                                       United States Magistrate Judge

---

of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).